1
2
3
4
5
6 **IN THE UNITED STATES DISTRICT COURT**
7 **FOR THE DISTRICT OF ARIZONA**
8

9 Kelly Standorf,                    No. CV-19-04700-PHX-JJT

10          Plaintiff,                **ORDER**

11 v.

12 Christie's Cabaret, *et al.*,

13          Defendants.

14

15      After a five day trial,[1] a jury found for Plaintiff Kelly Standorf and against

16 Defendants Out West Ventures d/b/a Christie's Cabaret ("OWV") and Steven Cooper,

17 awarding her $29,000 on her claim for violation of the Fair Labor Standards Act ("FLSA")

18 and $38,550 on her claim for violation of the Arizona Minimum Wage Act ("AMWA").[2]

19 At the conclusion of Plaintiff's case-in-chief, Defendants orally moved pursuant to Fed. R.

20 Civ. P. 50 on all of Plaintiff's claims. (Doc. 239.) The Court denied OWV's motion as to

21 the FLSA and AMWA claims but took under advisement OWV's Rule 50 motion as to the

22 issue of willfulness, as well as Mr. Cooper's Rule 50 motion as to his individual liability

23 under FLSA and AMWA and his willfulness—those portions of Defendants' oral Rule 50

24 motion are still before the Court.

---

25      [1] The Court notes that all trial counsel demonstrated highly commendable
26 professionalism, preparation and responsiveness to the Court's rulings throughout trial.

27      [2] Under applicable law, if the jury verdict survives Defendants' instant motions,
Plaintiff's FLSA damages award would be doubled to $58,000 and her AMWA award
28 would be trebled to $115,650. 29 U.S.C. § 216(b); A.R.S. § 23-364(G). To avoid double
recovery for the same injury, the smaller amount of FLSA damages would be engulfed by
the larger AMWA award, resulting in a total damages award of $115,650.

Timely after the verdict, Defendants renewed their motion Rule 50 motion for judgment as a matter of law, and in the alternative, moved for new trial pursuant to Rule 59. (Doc. 256, "Mot.") Plaintiff filed a Response in opposition (Doc. 266) and Defendants filed a Reply in support (Doc. 267). Plaintiff also filed a Motion for Attorneys' Fees (Doc. 255), and Defendants filed a Motion for Extension of Time to respond to the fee motion (Doc. 262), which Plaintiff opposed (Doc. 263). The Court addresses all of these motions below.

## I.    Defendants' Rule 50 Oral Motion and Renewed Rule 50 Motion

Both Defendants OWV and Cooper argue that "Standorf presented no evidence of an employer-employee relationship between OWV and Standorf within the relevant time frame," (Mot. at 3-4) which relationship was a necessary element for both of Ms. Standorf's claims. The "relevant time frame" to which Defendants refer is the two-year period—or three-year period if the violation was willful—immediately preceding Ms. Standorf's filing of her action during which both the FLSA and AMWA permit recovery for unpaid or underpaid wages earned in that period. Thus in the present case, where Ms. Standorf filed her Complaint on June 10, 2019 (Doc. 1),[3] Defendants could be liable for wages earned by one found to be an employee only from June 10, 2017 through June 10, 2019, or from June 10, 2016 to June 10, 2019 if a violation was willful.

Defendants' urge that the jury had no evidence before it of an employer-employee relationship between OWV and Ms. Standorf during that specific two or three year period. In so arguing, Defendants acknowledge that Ms. Standorf worked on OWV's premises for about 13 years before the period relevant for FLSA and AMWA liability. Defendants likewise acknowledge the Court's prior ruling that Ms. Standorf was "entitled to present evidence of her experience at the club before the liability period because it was relevant

---

[3] The Court notes that the parties agreed, and the jury instructions at trial reflected, that Plaintiff filed her action on July 10, 2019, and so the "look-back" period for liability for violations of AMWA and FLSA would extend either two or three years before that date. It appears upon review that date—and therefore the jury's instructions—errantly set the starting point for the damages limitation period one month later than they should have, as the docket confirms Plaintiff filed the action on June 10, 2019. (Doc. 1.) The Court addresses this issue in Section II of the Order.

insofar as any [possible employment] relationship formed between her and OWV carried forward into the liability period." (Mot. at 7.) But Defendants argue that Ms. Standorf did not present any evidence from which a finder of fact rationally could conclude that an employment relationship was formed between her and OWV at any time; and in the alternative, they assert that even if Ms. Standorf did adduce such sufficient evidence of an employment relationship, it was for a period outside the relevant time period—i.e. before June 10, 2016.

## A. Law

Judgment as a matter of law under Rule 50(a) or, if after the jury has returned a verdict, judgment notwithstanding that verdict under Rule 50(b), is proper "when the evidence permits only one conclusion as to the verdict." *Kay v. Cessna Aircraft Co.*, 548 F.2d 1370, 1372 (9th Cir. 1977); *see also Smith v. County of Riverside*, 2019 WL 988689 at *3 (C.D. Cal. January 24, 2019) (quoting *Kay*). The Court may grant such a motion only upon the conclusion that "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Rule 50(a)(1). In deciding whether this standard has been met, the Court must view the evidence in the light most favorable to the non-moving party—here, Ms. Standorf—and draw all reasonable inferences in that party's favor. *Josephs v. Pac. Bell*, 443 F.3d 1050, 1062 (9th Cir. 2005).

## B. Analysis

### 1. Evidence Adduced in Plaintiff's Case-in-Chief

Viewing the evidence introduced at trial in the light most favorable to Ms. Standorf and drawing all reasonable inferences in her favor, the Court cannot agree with Defendants' argument. Ms. Standorf introduced sufficient evidence from which the jury could conclude an employment relationship between OWV and her came into being at some point after she began as a "house mom" at OWV property Christie's Cabaret in 2002. And her evidence also supported a reasonable inference that that relationship continued into June 2018—in other words, through the time period where AMWA and FLSA liability could lie.

The parties stipulated, and the jury was instructed, that from late 2002 when Ms. Standorf began working at Christie's through 2004, she only provided "house mom services that are customary in the gentlemen's club industry such as providing beauty products, hair and makeup services, wardrobe and costumes for the entertainers." (Doc. 232 at 123.)[4] In other words, during that time Ms. Standorf provided services only to and for the entertainers, for which her only remuneration was tips from the entertainers. The parties also stipulated, and the jury was instructed to accept as proven, that during this period Ms. Standorf "did not perform any non-customary services such as auditioning and orienting new entertainers, enforcing Christie's house rules, overseeing extravaganzas [Christie's merchandise sales events promoted by the dancers that occurred hourly on certain evenings of the week] or collecting house fees from the entertainers"—in other words, she did not perform tasks that were in the regular course of OWV's/Christie's business. (Doc. 232 at 123.)

But the jury also heard, from Ms. Standorf and several other fact witnesses, including former managers at OWV/Christie's, that sometime after 2004, that changed. Ms. Standorf testified that from 2002 to 2004, when Andy Wallock was the general manager at Christie's, he had an "office girl" named Lorena who "took care of a lot of the paperwork and stuff." But about the time Wallock left in 2004, Lorena left and there was no one to perform those services. (Doc. 232 at 133.) At or shortly after that time, two other house moms from another Christie's club in Phoenix "came in and trained [Ms. Standorf]" on new duties, including signing the entertainers in when they arrived at the club and verifying through the shift how many entertainers were present; collecting house fees from the entertainers and keeping track of who paid and how much; auditioning prospective entertainers; orienting those who were hired by management and helping them with their on-boarding paperwork; recording the merchandise sold by each entertainer during the

---

[4] The trial transcript in this matter spans eight docket entries and each page of the transcript bears two numbers: one is the running page total for the transcript of the entire trial and the other is the page number within the specific docket entry. In referring to trial testimony, the Court will reference the appropriate docket number and then only the running page number.

"extravaganza" events at the club and reconciling returned unsold merchandise; tallying and faxing in to OWV's umbrella corporate office, Entertainment USA, the house fee and extravaganza paperwork at the end of the night; and signing entertainers out at the end of the night. (Doc. 232 at 138-147.)

When the new duties started and the house moms from the other OWV property came to train Ms. Standorf on how to perform them, she could not recall whether any manager explicitly told her *at that time* she must perform them:

> Q: Who told you that you would start doing these new things beyond the traditional house mom duties?
>
> A: Well, I don't know if it was really told or it was just kind of expected and then, you know, they start giving you the paperwork. I was trained by, actually, two other house moms at the other club at 32nd Street. They actually came in and trained me.

(Doc. 232 at 138.) But Ms. Standorf testified that she received the sign-in sheets, the new entertainer orientation and rule sheets, the extravaganza paperwork and the house fee sheets from "the management," (Doc. 232 at 142-46, 194) and that later at different times several managers told her that she was required to perform these tasks, including Taylor Kessler, Deborah Keane, Jon Gates and Cindy Cooper. (Doc. 232 at 143, 146, 148, 154.) The jury also saw a March 1, 2018 text manager Steve Proctor sent to Ms. Standorf, supporting the conclusion that OWV management held her responsible for the preparation and accuracy of the end-of-shift paperwork. In the text, sent at 3:24 a.m., Mr. Proctor asked Ms. Standorf to resolve a discrepancy between how many entertainers her faxed paperwork showed as having paid their house fees for the previous night and how many entertainers the point of sale terminal at Christie's Tempe had rung up as having paid. (Tr. Exh. 6 at 2.)

Ms. Standorf also testified that it was a daily part of her job to call in entertainers to ensure there were adequate dancers for the clientele on a given shift, and that managers directed her to do so several times, including on days she was not even present at the club to perform traditional house mom services for the entertainers. (Doc. 232 at 151.) The jury

heard that during one Thanksgiving when Ms. Standorf had travelled to Kansas and was not working, OWV general manager Taylor Kessler called and suspended her for a week because "there were not enough girls at the club on Thanksgiving Day." (Doc. 232 at 136.) Ms. Standorf also testified that if she herself would not appear on her regular nights as house mom, the managers told her she needed to arrange for a replacement. (Doc. 233 at 320.) And she testified that managers regularly instructed her to send out messages to entertainers to communicate Christie's/OWV's business, such as notices of rules and mandatory meetings. (Doc. 232 at 184-85.) Ms. Standorf introduced examples of such directives, including a November 28, 2016 text to her from Mr. Kessler directing her to notify all entertainers of an all-hands meeting. (E.g., Tr. Exh. 4.) Finally, the jury viewed and heard Ms. Standorf testify about a January 28, 2018 text from manager Steve Proctor to her saying, "Thank u for a great nite! U held the fort down while I was here, there and everywhere! 21k gross sales, 14,500 net after ChristiesCash payouts. C u Tuesday!" (Tr. Exh. 6 at 1.)

Other witnesses Ms. Standorf called at trial provided testimony on these claims. Kimberly Speaks worked at Christie's from 2014 to 2016 as a VIP hostess and a bartender. She testified that she would see Ms. Standorf collecting house fees from the entertainers, conducting auditions of potential entertainers, and "doing the extravaganza stuff," which included carrying the boxes of merchandise from the "back room" to the dressing room "just to give to the entertainers to take out onto stage and then to go sell to the customers." (Doc. 233 at 214-15.)

Keisha Walker worked at the club as an entertainer from 2007 to 2008 and again from 2010 to 2018. She told the jury she witnessed Ms. Standorf signing entertainers in at the beginning of shifts, collecting their house fees and transmitting them to the club, signing off to allow entertainers to leave at the end of the night, and checking entertainers for compliance with Christie's dress code. (Doc. 233 at 336-37.) She also witnessed managers "instructing [Ms. Standorf] on getting ready for extravaganzas" and questioning her on "how many house fees were paid." (Doc. 233 at 338-39.) Finally, Ms. Walker

testified that she thinks she witnessed Ms. Standorf collecting house fees in the presence of a Christie's manager. (Doc. 233 at 343.)

Jon Gates was a manager at Christie's Tempe and Phoenix clubs at some point during and or after 2005. He testified that at the Tempe club he would interact with and observe Ms. Standorf working for approximately an hour during the shift change on each of the four or five nights their schedules overlapped each week. Mr. Gates recalled that Ms. Standorf "would have the paperwork for the sign-in sheets for the girls, the check-in sheets," and she would sign off on exit passes allowing the entertainers to leave when they ended a shift. (Doc. 234 at 363.)  He also told the jury he observed Ms. Standorf involved in the extravaganzas "every day, all the time," and her activities included maintaining the checklist of

> what was purchased from the girls or, you know, all the names of the girls and then she would do their cash exchange and that kind of stuff. And then after everything was tallied up for after the extravaganza was done, we did take the cash to the bartender and then ring it in to the cash register.

(Doc. 234 at 364.) Mr. Gates also testified that he observed Ms. Standorf's involvement in delivering house fees for the entertainers to the bartenders to be rung in at the point-of-sale terminals, as well as auditioning new entertainers and orienting them, to include going over the paperwork involving the club's rules and regulations with the entertainers, and copying their IDs for the club and the liquor board. (Doc. 234 at 365-66.) He stated that his colleague, manager Cindy Cooper, expected Ms. Standorf to be at the club by 7 p.m. on nights she worked because Ms. Cooper expected her to check the entertainers in. (Doc. 234 at 367.) He testified that he himself expected Ms. Standorf to collect house fees from the entertainers, sign entertainers in and out and "run the extravaganza." (Doc. 234 at 389-90.)

Jennie Schell worked as a cocktail waitress at Christie's Tempe club from 2003 to somewhere between 2005 and 2007. She testified that based on her observations of Ms. Standorf working, it was Ms. Standorf's "responsibility to make sure girls showed up if there was a lot of customers and no entertainers. I feel like that was one of—it seemed like that was one of [Ms. Standorf]'s responsibilities." (Doc. 234 at 401.)  Ms. Schell

formed this conclusion in part because Ms. Standorf "used to have a clipboard. It had all their [the entertainers'] names and numbers. She was doing a lot of paperwork. I observed—I know I've heard some of the managers say, you know, 'we need girls,' and she would call them to get them to come in." (Doc. 234 at 401-02.)  It was Ms. Schell's understanding that Ms. Standorf handled the club's money for the extravaganzas, which occurred on the club floor where Ms. Schell worked: "I don't know the exact protocol or process, but it seemed like she was the one who got the girls to go out there and participate." (Doc. 234 at 402.) Ms. Schell also testified that at the bar in the club, she observed Ms. Standorf "collecting the money from the girls at some point in their shift and then paying the bartender." (Doc. 234 at 403.) According to Ms. Schell, Ms. Standorf collected and then paid these house fees over to the bartenders openly and in view of anyone present. Ms. Schell testified to her understanding that handling the club money, at least with respect to house fees and extravaganzas, "was part of [Ms. Standorf's] job." (Doc. 234 at 404.)

Belinda Speth worked at Christie's from 2005 to 2010 in the capacities of entertainer, VIP hostess and fill-in house mom. Ms. Standorf trained Ms. Speth to perform house mom duties. She testified that when she began working as house mom, managers Cindy Cooper and or Taylor Kessler "basically, as I recall, just said follow Kelly, she knows what she's doing." (Doc. 250 at 567.) She testified she served as house mom approximately 36 to 40 times. (Doc. 250 at 595.)

When Ms. Speth worked as house mom, she would sign the entertainers in when they arrived and later collect their house fees and pay them to the bartender; near the end of the night she would reconcile those fee figures by comparing her paperwork to the house fee payment receipts she obtained when she paid the entertainers' house fees to the bartender. (Doc. 250 at 567-68.) She recalled having conversations with the managers at the time—Mr. Kessler and Ms. Cooper—where they would inquire of her whether all entertainers had paid their house fees. (Doc. 250 at 568-69.) When she worked as house mom, Ms. Speth also would conduct auditions of new entertainers and would perform orientations with those who were hired, including helping them fill out paperwork and

going over house rules and policies. (Doc. 250 at 569-70.) Ms. Speth testified that managers were aware of her performing all of these duties as house mom. (Doc. 250 at 570.) No one ever told Ms. Speth to stop performing any of these tasks when she was filling in as house mom. (Doc. 250 at 580-81.)

### 2. Employment Factors Under FLSA

In evaluating an FLSA claim for wages the jury had to decide, taking into account the evidence described above, whether Ms. Standorf was an employee of OWV or not during the relevant lookback period of either two or three years before she filed this action. As the Court instructed at trial, in making this determination, the jury was to consider the following six non-exclusive factors: 1) the degree of OWV's right to control the manner in which the work was to be performed; 2) Ms. Standorf's opportunity for profit or loss depending upon her managerial skill; 3) Ms. Standorf's investment in equipment or materials required for the tasks; 4) whether the service Ms. Standorf rendered required a special skill; 5) the degree of permanence of the working relationship between OWV and Ms. Standorf; and 6) whether the service Ms. Standorf rendered was an integral part of OWV's business. (Doc. 249, Instr. 12.)

Viewing the above evidence introduced through Ms. Standorf and her witnesses in the light most favorable to her, as the Court must do here, the jury could rationally have found the factors weigh in favor of a finding that she and OWV had established an employee-employer relationship at some point after Mr. Wallock left the club in 2004. Factors 1, 3, 5 and 6 favor a finding of employment status and factors 2 and 4 are likely neutral.

Regarding factor 1, Ms. Standorf and the witnesses she called testified that OWV expected her to work defined shifts—Tuesdays through Saturdays, from approximately 6:30 p.m. to 2:30 a.m., and importantly, if she was not able to appear, she was expected to arrange house mom coverage. She and Ms. Speth testified that as house moms, they were required to use Christie's forms to sign entertainers in, to keep track of house fee payments and extravaganza transactions, and to total and report the final numbers from both of those

activities to the corporate office at the end of the night. Mr. Gates's testimony and Messrs. Proctor and Kessler's text messages also supported that this was management's expectation. And Ms. Standorf testified that she was trained in these duties, as well as on how to audition and orient new entertainers, by other house moms in the OWV umbrella who came to Christie's specifically for that purpose.

As to factor 3, separating out the non-traditional house mom duties that are at issue in this case, Ms. Standorf did not have to invest in any equipment or materials required for the sign-in, sign-out, house fee collection, extravaganza or final reporting duties, and for her entertainer communication duties she only had to have a smart phone with directories—OWV provided all forms, clip board and other materials for those tasks.

Regarding factor 5, Ms. Standorf worked at Christie's as a house mom for 16 years, the last 14 after Mr. Wallock left and she testified her duties changed to include the new tasks. The jury could divine a significant degree of permanence from that length and character of relationship.

As for factor 6, the jury easily could have concluded that the tasks at issue that Ms. Standorf testified she performed were integral to OWV's business. A gentlemen's club makes no money if there are not entertainers there to draw in customers, to keep them there, and to get them to spend. Thus, Ms. Standorf's asserted duties of contacting and calling in entertainers, checking them in, keeping track of them once they came in, controlling their departure, auditioning and orienting them were all functions central to OWV's ability to make money. And her involvement in the collection of house fees and extravaganza proceeds and the bookkeeping for those tasks also directly affected OWV's revenue. Both Steve and Cindy Cooper made this point when they testified during Plaintiff's case in chief that was why those tasks—especially the handling of company money—should have been handled by Christie's managers.

In contrast, factor 2 is nearly neutral, in that the connection between, on the one hand, Ms. Standorf executing the check-in, check-out, audition, orientation, extravaganzas and final evening reporting, and on the other hand, her opportunity for profit or loss, is

tenuous at best. It is only her handling of house fee collection that might provide some opportunity for getting a greater tip, or profit, from the entertainers by taking care of this time-consuming task, and none of these tasks presents the opportunity for her to suffer a loss. And factor 4 is at best neutral, as the tasks at issue do not require special skill.

The jury evaluated these factors, and considered other evidence that: 1) Mr. Kessler additionally exercised control over Ms. Standorf's work at the club by suspending her for a week for failing to meet his expectation that if she was absent, she still had to ensure that enough entertainers would be present to make the club profitable; 2) he and other managers would contact her when she was not working to ask or direct that she line up entertainers or broadcast text all entertainers about mandatory meetings; and 3) Mr. Proctor texted Plaintiff to thank her for "holding down the fort" one night in January 2018 when he was unavailable and the club had an exceptionally profitable night. (Tr. Exh. 6 at 1.) From all that evidence the jury rationally could conclude that an employee-employer relationship existed between OWV and Ms. Standorf.

Moreover, the jury had sufficient evidence before it to conclude that once the employment relationship was established, even if it was before the lookback period starting in June of 2016 or 2017, there was a reasonable inference that relationship continued into and through the relevant lookback period until Ms. Standorf stopped working at Christie's Tempe club on June 16, 2018. Such a conclusion would rest on Ms. Standorf's, Ms. Speth's and Mr. Gates's testimony that once the new duties accreted to Ms. Standorf, they never changed, as supported by Mr. Proctor's texts as late as April 2018 demonstrating his reliance as manager on Ms. Standorf's accounting for entertainer house fee collections.

Alternatively, the jury could rationally find that Ms. Standorf independently showed such an employer-employee relationship in the 2016-2018 timeframe, regardless of whether one existed previously, from the Proctor texts and from her testimony that each of the several times Mr. Cooper told her to stop handling club money and associated tasks, and she agreed to do so, the managers would wait a brief time and then "push the clipboard back to her" when she came in the office. Ms. Standorf presented sufficient evidence, if

credited, to allow the reasonable inference that the managers in that time period, while perhaps not directly ordering her to reassume the tasks, were sending a less-than-subtle message that she was to do the work. The Court thus will deny Defendant OWV's renewed Rule 50 Motion as to corporate liability under FLSA.

### 3.  Employment Factors Under AMWA

In evaluating Ms. Standorf's AMWA claim for wages, similar to their consideration of the FLSA claim, the jury had to decide whether she was an employee of OWV or not during the relevant lookback period of two or three years before the date she filed this action on June 10, 2019. And in making this determination, the jury was to consider the following seven non-exclusive factors that are similar but not identical to the FLSA factors discussed above: 1) the duration of the alleged employment relationship; 2) the method of payment; 3) who furnished the necessary equipment; 4) the right to hire and fire; 5) who bore responsibility for workmen's compensation insurance; 6) the extent to which OWV could exercise control over the details of the work Ms. Standorf performed; and 7) whether the work was performed in the usual and regular course of OWV's business. (Doc. 249, Instr. 15.)

These factors, although slightly different from the FLSA employment factors, balance very similarly. Factors 1, 3, 4, 6, and 7 lean sharply toward a conclusion of an employer-employee relationship after considering the evidence Ms. Standorf presented to the jury; and factors 2 and 5 lean against the finding of such a relationship. The Court will not repeat its analysis here. It finds, for the reasons set forth above in Section I.B.1 of the Order, that for purposes of the AMWA claim, the jury had sufficient evidence to rationally conclude that an employer-employee relationship existed between OWV and Ms. Standorf either before the relevant lookback period and then continued its course through that period, or independently existed in and throughout the lookback period, whether two or three years from the date of her filing this action. For that reason, the Court will deny OWV's renewed Rule 50 Motion as to AMWA liability.

#### 4.  OWV's General Arguments Against Liability

In reaching the above conclusions, the Court acknowledges and accepts Defendants' argument that Ms. Standorf "cannot, as a matter of law, make herself an employee through her own conduct." (Mot. at 7.)[5] But Ms. Standorf introduced evidence that it wasn't her conduct that created the employment relationship. Rather, it was the conduct of OWV employees, principally Christie's managers, in accreting the duties to Ms. Standorf and communicating their expectation that she perform them, that made her an employee in the eyes of the jury. Those actions included bringing other house moms in to train Ms. Standorf in the additional duties. They also included providing her the "clipboard" and various Christie's forms for check-in, check-out, house fee recordkeeping, extravaganza record keeping and final evening reporting to the corporate office. Finally, the managers repeatedly and consistently over a fourteen-year period pushed those duties to Ms. Standorf, even after the owner of the company told her to stop doing them, and in at least one case, disciplined her by suspending her when she didn't perform the entertainer call-in duties as they expected.

During Plaintiff's case-in-chief, all parties examined her and Mr. Cooper extensively about two to three face-to-face meetings, and possibly two telephone conversations between the two. (Doc. 250 at 505-09; Doc. 233 at 229-30.) In these conversations, Mr. Cooper explicitly told Ms. Standorf that collecting entertainer house

---

[5] Defendants also make the related argument that it was error for the Court to omit from the final jury instructions the statutory language of the FLSA providing that an employee is "any individual employed by an employer," 29 U.S.C. § 203(e)(1), and that of the AMWA stating that an employee is "any person who is or was employed by an employer." A.R.S. § 23-362. The Court cannot agree. In addition to the statements being rather obvious, their meaning was well covered by the instructions the Court did give. (*See, e.g.,* Doc. 249, Instr. 15 ("For the AMWA claim, you must decide whether Ms. Standorf was an employee of OWV or not," and "whether someone is an employee of an employer usually rests on the extent of control the alleged employer may exercise over the details of the work."); Instr. 10 (instructing that on the FLSA claim, Plaintiff must prove that she "was an employee of Defendant OWV during the relevant period"); Instr. 12 ("You must decide whether Ms. Standorf was an employee of OWV or not"); Instr. 14 (for Plaintiff to succeed on her AMWA claim, the jury must find "that Plaintiff was an employee of Defendant OWV during the relevant period"). The jury also was instructed on the lists of factors they were to consider in deciding whether Ms. Standorf was an employee of OWV as set forth above. (Doc. 249 Instrs. 12, 15.) The extant jury instructions thus made clear the meaning of "employee" under the state and federal statutes, what the jury had to decide, and how.

fees, running extravaganzas, completing and faxing to the corporate office the nightly paperwork including entertainer sign-in sheets, house fee totals and extravaganza totals, was the work of Christie's managers and other employees, and directed Ms. Standorf not to do those things. (Doc. 250 at 507-08.) And the parties do not dispute that each time Mr. Cooper and Ms. Standorf discussed this issue, Ms. Standorf agreed she would not perform those tasks. (Doc. 250 at 531; Doc. 233 at 232, 237-38.) Mr. Cooper would leave and Ms. Standorf thereafter would refrain from the tasks for a few days or weeks, but then resume them, she testified, at the behest of her managers:

> Q: Did any manager at Christie's ever tell you, "Hey, don't fill that out. You don't need to fill it out. It's not your job"?
>
> A: there were a couple of times that, yes, we were—the house moms we're told not to be doing that stuff anymore, and it was by Mr. Cooper. I think myself, I maybe had spoken to Mr. Cooper once or twice about it but then—and he would talk to his managers about it, and then, you know, they were good for a little bit, and then it would go right back to the house mom.
>
> Q: When you say, "it would go right back to the house mom," what do you mean?
>
> A: Go right back to the house mom doing the manager's work.
>
> Q: How did you know that it was coming back to you?
>
> A: "Hey, don't forget your clipboard there. Get your clipboard."
>
> Q: who would say that?
>
> A: I heard it from [manager] Debbie [Keane]. I heard it from [general manager] Taylor [Kessler].
>
> . . . .
>
> Q: And that's paperwork you're referring to was on the clipboard?

> A: Yes.

(Doc. 232 at 146-47.) Further:

> Q: OK. And I believe you testified on direct you would stop for a while?
>
> A: I would stop until the managers had the house moms—not just this house mom, but the house moms—do the paperwork.
>
> ….
>
> Q: So it's your testimony that each time you did something outside of what Mr. Cooper asked you to, a manager specifically told you to do it?
>
> A: No. After a while it was just taken for granted that— or I shouldn't say taken for granted. That it was just part of the daily job.
>
> Q: Part of your understanding of what the job was?
>
> A: And the managers as well.

(Doc. 233 at 232, 234.).

Defendants' argument that Ms. Standorf cannot make herself an employee when the "owner has forbidden such conduct" is unpersuasive under the circumstances here, where each time Mr. Cooper told Ms. Standorf to stop doing tasks for Christie's –times that were infrequent and always followed by Mr. Cooper's departure and subsequent absence for long periods—the site managers, who were always present, would immediately hand Ms. Standorf her clipboard with Christie's forms and tell her to get back to it. Ms. Standorf testified to this point as well:

> I was with the managers five nights a week for 16 years, five nights a week. I maybe saw Mr. Cooper that entire time maybe—at the club maybe five times, possibly five. I worked with those managers day in and day out. They were taking

direction from Mr. Cooper, not me. I was taking direction from
the managers that worked for Mr. Cooper.

(Doc. 233 at 235.) From this evidence the jurors could reasonably conclude that Mr. Cooper did not do enough to rectify his managers' allowance, encouragement or even direction to Ms. Standorf to perform the management tasks at issue. This was reflected in a juror's written question of Mr. Cooper asking, "Were any of the managers reprimanded for allowing Ms. Standorf to collect fees or do other paperwork or managerial things?" (Doc. 250 at 549.) Following up on Mr. Cooper's response of "If I found out about it, yes, sir," Plaintiff's counsel conducted the following examination:

Q: You said that you would discipline someone if you found out that they let Ms. Standorf continue collecting house fees and whatnot, right?

A: Yes, Sir.

Q: You disciplined Mr. Kessler then?

A: Kessler's the one that called—called me on a couple occasions. He's one reason I went in the first or second time to talk to Kelly because he couldn't control her so he chose me. You can ask him when he takes the stand.

Q: Sir, I guess I'm not talking about the first time you found out. I'm talking about after you had talked with Kelly, after you found out and then you talked with Kelly, and then you discovered that it's still happening, did you discipline any manager for that?

A: I had a talk with him, including my sister [manager Cindy Cooper], and they said Kelly kind of does her own thing. I said Kelly don't need to do her own thing. She needs to follow company policy.

Q: Aside from that conversation, did you do any discipline in writing or anything like that?

A: No, sir.

- 16 -

(Doc. 250 at 551-52.) This testimony provided rational basis for the jury to conclude that the owner did not effectively "forbid such conduct." Alternatively, the jury could reasonably infer from the evidence that this was by design—that Mr. Cooper's admonitions to Ms. Standorf to stop performing management tasks were intended to give OWV and himself plausible cover, but his repeated failure to follow up and the managers' subsequent direction for her to resume the duties in question were coordinated to invite Ms. Standorf to infer she was to perform the tasks. While the undersigned might not reach this latter conclusion upon weighing the evidence, the Court is not the finder of fact; the jury is, and the jury had sufficient evidence, taken in the light most favorable to Plaintiff, to reach such a conclusion.

In either case, the jury rationally could conclude, if they found credible Ms. Standorf and the other Christie's manager and employee witnesses she presented in her case-in-chief, that she was expected to perform these duties by the on-site day-to-day managers—the same managers who had suspended her before for failing to line up entertainers on a day she was not working—regardless of any directive from a rarely present Mr. Cooper.

### 5.  Individual Liability for Mr. Cooper

Although Defendants state in their opening that Mr. Cooper reasserts his Rule 50 Motion as to his individual liability, they do not treat with this issue in the body of their brief other than as it overlaps with the arguments as to OWV's liability. In any event, the Court concludes that the evidence Ms. Standorf presented in her case in chief is sufficient for a jury to rationally conclude that Mr. Cooper played a substantial role in the FLSA and AMWA violations—that he exercised control over the nature and structure of the relationship between Christie's Tempe club and Ms. Standorf. Mr. Cooper himself testified that he knew Ms. Standorf was working at that club as a house mom for all the years she was there; that he made the decision that the house mom position was unpaid; that he decided to terminate the other approximately 12 house mom positions in his other clubs but deliberately allowed Ms. Standorf to continue in that capacity; that he set all policies for Christie's/OWV, including who in the club could undertake what tasks; that he set

reporting requirements for what forms Christie's and all of his clubs would have to fax in on a nightly basis, including a form he referred to as "Entertainer Fee Sheet/House Mom," and other documents that Ms. Standorf filled out; and that he made the decision to terminate Ms. Standorf in July of 2018 and do away with that final house mom position under the OWV umbrella.

### 6. Willfulness

A defendant's conduct with respect to the FLSA and or the AMWA is willful if the failure to pay minimum wage is not merely negligent, but is found instead to be knowing or reckless. That is, a defendant must know that the failure to pay was prohibited by the FLSA's minimum wage requirement, or was in reckless disregard of the requirement—that it was borne of a failure to make adequate inquiry into whether conduct was in compliance with the FLSA or AMWA as applicable. The Court concludes the evidence Ms. Standorf produced at trial was sufficient for a rational jury to find that the violations by both OWV and Mr. Cooper were willful. The evidence that OWV and Mr. Cooper had previously litigated class FLSA and AMWA claims by entertainers at Christie's Tempe club was sufficient by itself to meet this burden. A jury could find from that evidence, regardless of whether OWV and Mr. Cooper won, lost or settled the prior class action, that they were aware of the minimum wage law requirements' existence and the possible consequences of not properly classifying someone as an employee and instead treating them as an independent contractor in derogation of the law. The jury even heard evidence that OWV manager Taylor Kessler discussed the class action with Ms. Standorf, musing that she might have an even better claim than the entertainers who brought it based on the nature of the tasks she performed for the club. The Court will deny the Rule 50 motion as to willfulness.

### II.    Rule 59 Motion for New Trial

In the alternative to their renewed Rule 50 motion, Defendants move pursuant to Rule 59 for a new trial on the same basis they raise in their Rule 50 motion. They

additionally urge that a new trial is necessary because the jury was confused by an errant instruction and misled by argument of counsel.

### A. Law

Unlike with a Rule 50 determination, the District Court in considering a Rule 59 motion for new trial is not required to view the trial evidence in the light most favorable to the verdict. Instead, the District Court can weigh the evidence and assess the credibility of the witnesses. *Experience Hendrix LLC v. Hendrickslicensing.com Ltd*, 762 F.3d 829, 842 (9th Cir. 2014 ). Moreover, a District Court can grant a new trial under Rule 59 on any ground necessary to prevent a miscarriage of justice. *Id.*; *see also Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990) (recognizing that under Fed R. Civ. P. 59(d), the court has *sua sponte* power to grant a new trial on grounds not alleged by a party).

### B. Analysis

#### 1. No New Trial on Liability Issues

The Court will not order a new trial regarding liability of either Defendant under the FLSA and AMWA claims, nor on the jury's finding of willfulness. That is to say, considering the analysis in Section I of the Order above, the Court assesses the credibility of most of the witnesses similarly to the jury, and where the Court might differ on degrees of credibility of an individual witness, the jury's findings do not strike it as unfair or even approaching a miscarriage of justice. Rather, the jury's conclusions as to liability and willfulness are firmly within the range of reasonable outcomes in light of the evidence, even if re-weighed by the Court.

Nor does the Court agree with Defendants that an element of opposing counsel's closing argument—that Ms. Standorf's entire 16-year relationship with OWV was relevant to OWV's liability on the wage claims—confused the jury and resulted in an unfair trial. Defendant argued two flavors of confusion resulted from this argument: 1) it gave "the impression that [Ms. Standorf] can establish damages during the lookback period if she is found to be an employee during any of the time she spent at the club" (Mot at 8-9); and 2) it created confusion over what period the jury could award damages altogether. (Mot. at 9-

10 (suggesting that a juror question during deliberations indicated jury confusion on the "timeframe of compensation."))

Defendants' first argument fails because, as set forth above in Section I, the jury had sufficient evidence to conclude either that events occurred in the lookback period that independently supported a finding of an employer-employee relationship during that lookback period, or that an employer-employee relationship was formed at some point before the lookback period and that relationship simply continued into and through the lookback period based on the actions of OWV personnel. Additionally, Plaintiff's counsel's relevance argument and the language he used did not misstate the law or mislead the jury.

Defendants' second argument is belied by the jury's verdict, which demonstrates the jury correctly understood the temporal limitations on damages. The jury awarded Ms. Standorf $29,000 on her FLSA claim after being instructed that minimum wage for the entire lookback period was $7.25 per hour. This means the jury awarded damages for 4000 hours worked, or two years' worth of full-time wages. The jury limited their FLSA award to two years' worth of wages despite their finding that Defendants acted willfully in violating FLSA and therefore the lookback period was three years from the date of filing of suit. The jury thus correctly understood that because Ms. Standorf stopped working at Christie's on June 16, 2018, she was not eligible for a wage award over the last year of the lookback period.

The jury's damages award on the AMWA claim further confirms it understood the temporal limitations to the award. The jury awarded Ms. Standorf $38,550 on her AMWA claim and did not break that amount down over the lookback period. In light of the fact that the AMWA prescribed a different mandatory minimum hourly wage each year during the lookback period, however, the only rational arithmetic way the jury could have reached that precise total was as follows:

| Year | AMWA minimum hourly rate | Hours | Total Wages |
|------|--------------------------|-------|-------------|
| 2016 | $8.05/hr | 1000 hrs | $8,050 |

| 2017 | $10.00/hr | | 2000 hrs | $20,000 |
| 2018 | $10.50/hr | | 1000 hrs | $10,500 |
| **TOTAL** | | | **4000 hrs** | **$38,550** |

As 1000 hours equates to approximately six months full-time work, the jury very likely found Ms. Standorf was entitled to AMWA minimum wages for the last six months of 2016 (at $8.05 per hour), all of 2017 (at $10.00 per hour) and the first six months of 2018 (at $10.50 per hour). This calculation lines up with the eligible three-year lookback period, which would have started June 10, 2016 and ended in late June 2018 when Ms. Standorf was terminated. It supports the Court's conclusion that the jury properly understood: 1) the operation of the lookback period after its finding that Defendants acted willfully; and 2) that it could not award wages for time in the lookback period after Ms. Standorf had stopped working at Christie's.

### 2.  New Trial as to Damages

As noted above, pursuant to Rule 59(d) the Court is empowered to grant a new trial on any ground necessary to prevent a miscarriage of justice, including grounds not raised by the parties. *Experience Hendrix*, 762 F.3d at 842; *Murphy*, 914 F.2d at 187. The Court will grant a new trial here on the issue of damages, upon a finding that, while the jury followed the damages instructions it was given, the Court gave incorrect instructions on damages based on a review of the facts and the applicable law.

The specter of an adjustment of offset for a tipped employee appeared three times during the trial, but disappeared just as quickly, without resolution.[6] In each instance, the

---

[6] The first instance at trial in which the parties discussed the possibility of an offset occurred at sidebar during the cross examination of Ms. Standorf as the parties argued the admissibility of a document potentially probative of her earnings. At that point, the Court noted as follows:

The topic of what Ms. Standorf earned bleeds over into other things because it has occurred to me ahead of time—you know, I've not seen presented to me at any point dollar amounts on what plaintiff is going to ask for, but if indeed the jury were to conclude and find the defendant or defendants liable, it did occur to me that the issue would be that if the jury were to conclude that the plaintiff was an employee or should have been treated as one, what we're looking at is a tipped employee and so if there were damages to be found, there would be an offset for whatever was earned, tipped, so these numbers in some

undersigned had considered whether the jury instructions should contain an offest provision for tips Ms. Standorf earned. However, the parties appeared to agree neither wished to pursue such an instruction. In the second discussion of a possible offset, Plaintiff's counsel stated his belief that "There's no offset issue here. Christie's has paid her nothing," to which Defense counsel responded, "Agreed...I'm not suggesting that there's an offset or anything like that." (Doc. 238 at 793-94.)

Based on the parties' stated positions above and the fact that no party offered any instruction addressing offset for tipped employees, the Court did not *sua sponte* pursue such an instruction further. The Court now concludes it should have done so, and its failure to do so was an error that likely worked an unfairness to Defendants.

---

respects are relevant to that.

(Doc. 233 at 245.) As the parties were primarily focused on the admissibility of the exhibit at issue, neither engaged the Court's observation about offsets for tipped employees at that time.

The final time the issue arose at trial was during the charging conference, as the parties were arguing a jury instruction on which party had the burden of proof on the AMWA claim. Defense counsel noted that

It seems to us that if we were going to be saddled with a burden of proof as though we were the party that contracted with Ms. Standorf as an independent contractor, then, respectfully, "sauce for the goose"; we would like to be credited with the money paid to her. And under that analysis, she's been made whole. If she worked 45 hours a week at the minimum wage in effect in 2016, 2017, in 2018, she actually made more than minimum wage.

(Doc. 238 at 826-27.) The Court engaged on the topic, responding in relevant part,

…I've been thinking about this a lot. And you heard me at sidebar the other day mention offset, because I remember the analogy I gave you earlier in the case at the final pretrial where the court gets to see only what is presented to it by the parties for purposes of the limited decisions it has to make at any given time and no one has shared anybody's thoughts or theories on that issue with me. I figured at some point it may well come up and maybe it's coming up in the context of "if there's a jury verdict for the plaintiff, there's a motion for remittitur at the end," but both the Fair Labor Standards Act and the Arizona Minimum Wage Act include provisions for tip offset by statute. So 29 U.S.C. Section 203(m) for the Fair Labor Standards Act and A.R.S. Section 23-363(C) for the Arizona Minimum Wage Act. And I figured at some point we'd jump that bridge but because no one is presenting to me instructions about it now or evidence to the jury, that was something that you were leaving to the court after the fact, so—just so everybody knows where I am on the issue.

(Doc. 238 at 827-28.) Thereafter, no party sought to engage on the issue or propose jury instructions to that effect.

Plaintiff's counsel's argument that "there is no offset issue here because Christie's has paid her nothing" misses the point and is only partially a correct statement of law. Once the jury determined that Ms. Standorf was an employee of Christie's during the relevant period, it is beyond dispute that she was a tipped employee. All parties agree that Ms. Standorf's only source of income for her work at Christie's Tempe was the tips she would receive from entertainers. It is true that Christie's paid her nothing, but it is also true that someone—the entertainers—paid her tips. And as set forth below in Section II(B)(2)(a) and (b), both the FLSA and AMWA provide for an offsetting tipped employee credit, where a defendant can show it met the requirements thereof. So, there is a question to be decided by the finder of fact, in the form of whether those FLSA and AMWA provisions that allow an employer a credit for tipped employees apply to the facts of the case. The Court must therefore determine whether the tipped employee provisions of the FLSA (29 U.S.C. § 203(m)) and AMWA (A.R.S. § 23-3363(C)) could apply and if either could, a jury must find 1) whether they do apply and 2) if so, what the offset is upon application of the respective laws.

### a.  FLSA Offset for Tipped Employee

Section 3(m) of the FLSA defines the term "wage." The 1966 amendments to the FLSA provide within that definition of "wage" that an employer could utilize a limited amount of its employees' tips as a credit against its minimum wage obligations to those employees through a so-called "tip credit." 29 U.S.C. § 203(m). Section 3(m) provides in relevant part that

> [i]n determining the wage an employer is required to pay a tipped employee, the amount paid such employee by the employee's employer shall be an amount equal to—
>
> (1) the cash wage paid such employee which for purposes of such determination shall not be less than the cash wage required to be paid such an employee on [August 20, 1996]; and
>
> (2) an additional amount on account of the tips received

by such employee which amount is equal to the difference between the wage specified in paragraph (1) and the wage in effect under section 206(a)(1) of this title.

29 U.S.C. § 203(m). Department of Labor regulations illustrate with an example how the tip credit would operate:

> As amended in 1996, section 3(m) provides that the "wage" of a tipped employee equals the sum of the cash wage paid by the employer, which is fixed at a minimum of $2.13 an hour, and the amount it claims as a tip credit. The maximum permissible tip credit under section 3(m) is calculated using the current Federal minimum wage. Thus, in a situation in which an employee earns $10 an hour in tips and the employer pays $2.13 an hour in cash wages and claims the statutory maximum as a tip credit, the employee has received only the minimum wage because tips in excess of the maximum tip credit are not considered "wages" under 3(m). *Using the current minimum wage of $7.25 an hour as an example, the maximum permissible tip credit is $7.25 minus $2.13, which permits the employer to take a tip credit against its minimum wage obligation of $5.12 an hour, provided it has informed its tipped employees of the tip credit provision and has permitted the employees to retain all of their tips.*

Updating Regulations Issued Under the Fair Labor Standards Act, 76 FR 18832, 18839 (Apr. 5, 2011)(emphasis supplied). Thus, if the FLSA tip credit applied in Ms. Standorf's case, assuming the jury found that she earned from tips on average of at least $5.12 per hour worked in a pay period, the tip credit offset could reduce OWV's wage owed to as little as $2.13 per hour worked. This would be considerably less that the $7.25 per-hour-worked figure that the Court instructed the jury to apply to Ms. Standorf's FLSA claim at trial.

The Court concludes, however, that Defendants cannot meet the requirements for the FLSA's tipped employee offset to apply in this matter. This is because Section 3(m) also requires, in relevant part, that an employer cannot take the tipped employee credit "unless such employee has been informed by the employer of the provisions of this

subsection." 29 U.S.C. § 203(m)(2)(A). And the Ninth Circuit has made clear that this provision of section 203(m) requires employers to give their employees notice of their intent to use a tip credit prior to actually taking the credit. *Oregon Rest. & Lodging Ass'n v. Perez*, 816 F.3d 1080, 1083–84 (9th Cir. 2016). The Department of Labor has reached the same interpretation:

> Prior notice by the employer to employees of the employer's intent to avail itself of the tip credit is a statutory requirement pursuant to the 1974 amendments. Courts have disallowed the use of the tip credit for lack of notice even "where the employee has actually received and retained base wages and tips that together amply satisfy the minimum wage requirements," remarking that "[i]f the penalty for omitting notice appears harsh, it is also true that notice is not difficult for the employer to provide." Reich v. Chez Robert, Inc., 28 F.3d 401, 404 (3d Cir. 1994) (citing Martin v. Tango's Restaurant, 969 F.2d 1319, 1323 (1st Cir. 1992)).

73 Fed. Reg. 43,654, 43,659 (July 28, 2008).

In the present case, Defendants' theory of defense and their assertions to the jury preclude them from meeting this requirement. No one offered evidence that OWV provided prior notice—or any notice— to Ms. Standorf of an intent to avail itself of the tip credit. Indeed, OWV could not and would not provide such evidence, as it maintained that Ms. Standorf was not an employee. Thus, the tipped employee credit or offset under FLSA Section 3(m) is inapplicable to the facts of this case, and the Court will not order a retrial of FLSA damages that would make that credit available.

### b. AMWA Offset for Tipped Employee

The tipped employee offset as applied to Plaintiff's AMWA claim stands in a different stead, as Arizona's offset law has different requirements:

> For any employee who customarily and regularly receives tips or gratuities from patrons or others, the employer may pay a wage up to $3.00 per hour less than the minimum wage if the employer can establish by its records of charged tips or by the employee's declaration for federal insurance contributions act

> (FICA) purposes that for each week, when adding tips received to wages paid, the employee received not less than the minimum wage for all hours worked. Compliance with this provision will be determined by averaging tips received by the employee over the course of the employer's payroll period or any other period selected by the employer that complies with regulations adopted by the Commission.

A.R.S. § 23-363(C). If applicable, Section 23-363 could reduce Defendant's liability for any wages earned by Ms. Standorf from July 10, 2016 through the end of 2016 from $8.05 per hour to as little as $5.05 per hour; any wages earned by her in 2017 from $10.00 per hour to as little as $7.00 per hour; and any wages earned by her between January 1 and June 16, 2018 from $10.50 per hour to as little as $7.50 per hour. Had the jury in the previous trial applied Section 23-363(C)'s tip offset, its AMWA award would have been reduced from $38,550 to as little as $26,550. Thus, the potential affect on any award is substantial.

Section 23-363(C) requires that in order to take the $3.00 per hour tip credit, the employer must establish that between the reduced minimum wage payment and the tips the employee received, the employee's total compensation still meets or exceeds the total Arizona minimum wage applicable at the time. In the present case, then, Defendants would be required to show that Ms. Standorf received an average of at least $3.00 per hour in tip income for each pay period she worked during the lookback period. And the statute requires Defendants to show this through either 1) its records of charged tips or 2) by Ms. Standorf's declaration for FICA purposes.

It is clear Defendants cannot show tip income via any records of charged tips because they kept no such records. However, Defendants may be able to make the showing through Plaintiff's tax filings or other records produced during discovery in this matter. The Court thus will grant a new trial on AMWA damages to allow Defendants to attempt to make the above showing.[7]

---

[7] In so ruling, the Court observes that any offset to the AMWA damages, even if maximized to $12,000, would—once trebled for judgment—result in likely no more than

Finally, as the Court noted in footnote 3, it previously erred in instructing the jury that the lookback period upon a finding of willfulness by Defendants ran from July 10, 2016 to July 10, 2019. The actual lookback period ran from June 10, 2016 to June 10, 2019. Although this error had the potential to shorten Plaintiff's recovery of damages under both her AMWA and FLSA claims by one month, it was not by itself enough to conclude a new trial was necessary to avoid miscarriage of justice. But because the Court will order a new trial on AMWA damages for the more structural issue of offset for tipped employees, it will also correct instructions regarding the lookback period start date and allow the jury to consider the correct amount of both AMWA and FLSA damages in light of the one-month adjustment to the lookback period.

**III.    CONCLUSION**

For the reasons set forth in detail above,

**IT IS ORDERED** denying Defendants' renewed Rule 50 Motion for Directed Verdict (Doc. 239) and Motion for Judgment Notwithstanding the Verdict. (Doc. 256.)

**IT IS FURTHER ORDERED** granting in part and denying in part Defendants' Rule 59 Motion for New Trial (Doc. 256). The Court grants the Motion for new trial as to damages and denies the Motion as to Defendants' liability and willfulness.

**IT IS FURTHER ORDERED** denying as premature and without prejudice Plaintiff's Motion for Attorneys' Fees (Doc. 255).

**IT IS FURTHER ORDERED** having denied Plaintiff's attorney fee motion, the Court will deny as moot Defendants' Motion to Extend Deadline to Respond to Plaintiff's Attorney Fee Motion (Doc. 262).

. . .

---

a $36,000 change in the ultimate potential damages award. In such a circumstance, the parties may conclude that economic and efficiency concerns counsel against expending the time and resources for a new jury trial, even one so limited in scope. The Court thus will entertain any alternative resolutions or partial resolutions the parties might jointly propose, such as a bench trial on damages, a stipulation that the AMWA tipped credit offset does or does not apply, or other stipulation as to damages that would preserve all parties' rights to appeal the Court's other rulings. The parties may therefore wish to discuss such alternatives to a new jury trial on damages at their meet-and-confer prior to the status conference the Court will order below to set a new trial date.

**IT IS FURTHER ORDERED** setting this matter for a status conference on **June 5, 2025 at 9:00 AM** (Arizona time) in Courtroom 505, 401 W. Washington Street, Phoenix, AZ 85003 before Judge John J. Tuchi, to set a date for the new trial on damages. The Court will allow telephonic appearance upon motion. The parties shall meet and confer at least one week before the status hearing.

Dated this 25th day of April, 2025.

Honorable John J. Tuchi
United States District Judge